UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-317 (MJD)

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>  )<br>            Plaintiff,   )<br>  )    GOVERNMENT'S SENTENCING<br>        v.   )    MEMORANDUM<br>  )<br>WAYNE ROBERT LUND,   )<br>  )<br>            Defendant.   ) | |

The United States of America, by and through its undersigned attorneys, hereby respectfully submits its position and memorandum on sentencing. The United States recommends a sentence of 57 months' imprisonment, the high-end of the applicable Guidelines range of 46 to 57 months, as a sentence that is sufficient but not greater than necessary to comply with the Section 3553(a) sentencing factors.

**RELEVANT FACTS AND PROCEDURAL BACKGROUND**

The United States agrees with, and incorporates by reference, the facts from the "Offense Conduct" section of the PSR, ¶¶ 5-9, as well as the facts from the Plea Agreement, ECF 46, ¶ 2.

Shortly after 2:00 a.m. on November 2, 2024, police conducted a routine traffic stop of the defendant's vehicle, within two to three miles of the Wisconsin borderline. The Officer learned that the vehicle's registration had expired in August 2023 and that the defendant, the registered owner of the vehicle, had a revoked driver's license. The defendant could not provide a driver's license or proof of insurance, and told the Officer that he was homeless and currently staying at a hotel in Stillwater, MN. The

Officer conducted a driving-record check, learned that the defendant had two prior convictions for lack of insurance, and arrested the defendant for gross misdemeanor insurance violation.

During a lawful inventory search of the defendant's vehicle prior to towing, police located 7 CO2 cartridges with sealed orange taped wicks or fuses coming out of them in a military style pouch under the rear seat and one eight-inch PVC pipe bomb in the rear trunk area that had caps screwed in on both ends.





Officers later called the Saint Paul Bomb Squad for assistance, and the Bomb Squad identified the CO2 cartridges from photos as suspected "cricket" bombs, an informal term used by law enforcement to describe destructive devices constructed by packing explosive material into CO2 canisters. Bomb Squad officers responded to the impound lot to properly and safely handle, remove, and render safe the suspected

explosive devices, and local officers and firefighters evacuated nearby businesses and residences in the immediate area of the impound lot. Other Officers responded to the defendant's hotel room in Stillwater to secure the room and evacuate the area in case there were explosive devices in the defendant's hotel room.

The Saint Paul Bomb Squad determined that the cricket bombs and the PVC pipe bomb contained black-colored powder, which ignited when tested and was



deemed energetic, i.e., explosive. The Bomb Squad also discovered that one end of the PVC pipe device had a small hole drilled into it inserted with the possible remnants of a fuse, which they suspected may have been previously lit but failed to detonate the PVC pipe bomb. The PVC pipe bomb was also found to contain apparent glass shards, which would have acted like shrapnel upon explosion of the pipe bomb. The remains and contents of the 7 $CO_2$ cricket bombs and the PVC pipe bomb were shipped to the FBI Lab in Quantico, Virginia, for forensic analysis and testing, which confirmed the devices contained energetic material.

During the search of the defendant's hotel room under a state-issued search warrant, Officers discovered: a) multiple documents related to American Nationals and the Minnesota State Assembly (i.e., sovereign citizen movement); b) 5 $CO_2$ cartridges, similar to the cricket bombs; c) 5 shotgun primers; d) 18 electronic devices

and media, including multiple cellphones, a laptop, tablets, hard drives, and SD cards; e) a three-ring binder entitled "List of Pyro Chemicals and Terms," with several terms highlighted, including detonate, flash powder, black powder, delay fuse, and classes of explosives; f) a locked personal safe containing 804 rounds of ammunition; g) 7 high-capacity rifle magazines filled with nearly 200 rounds of high-velocity .223-caliber ammunition; h) the defendant's Minnesota ID and several traffic citations issued to him; j) an airsoft grenade; and k) a small quantity of white crystal methamphetamine.











ATF conducted a record search with the National Firearm Registration and Transfer Record (NFRTR) and learned that the defendant did not have any destructive devices registered with the NFRTR, as is required by the National Firearms Act under Title 26.[1]

Agents and officers executed a federal search warrant on a freezer chest belonging to the defendant located at a property in Wisconsin associated with the defendant. The defendant used the freezer chest for storage. During the search, law enforcement located the following: a) another suspected cricket bomb, nearly identical to the seven recovered from the defendant's vehicle; b) about 117 $CO_2$-style empty metal cartridges; c) PVC pipes capped on one end; d) hobby fuse, consistent with the wicks used in the cricket bombs; e) black powder precursors; and f) a gallon-sized milk jug half-filled with dark powder, later determined to be energetic.[2]






---

[1] Though the defendant claims that the residual energetic material remaining within the PVC pipe bomb excludes it from being a "destructive device," (PSR ¶ 16, n.5), the presence of energetic material within it still qualifies it as an "incendiary" device, because Title 26 defines a "destructive device" to include "any . . . incendiary . . . bomb, . . . or . . . similar device," under 26 U.S.C. § 5845(f).

[2] Bomb technicians estimated that there were enough explosive material for making dozens of additional $CO_2$ cricket destructive devices. (ECF 20, ¶ 4)

During a Mirandized recorded interview, the defendant admitted to manufacturing the CO2 cricket bombs in Wisconsin by filling them with one to two grams of explosive material, which he made, and inserting a wick into them, but he claimed that they are rocket engines. According to FBI Bomb Technicians, however, the cricket bombs are not propellants but destructive devices, because the energetic material confined in the CO2 cartridge will create an overpressure effect when ignited, causing all the blast pressure from inside the container to combust and possibly emit shrapnel from the exploding cartridge casing. (*See* ECF 20, ¶ 3; PSR ¶ 13, n.4)  The defendant further stated the he has an interest in explosives as a hobby.  The defendant also claimed that he is an "American National," and is purportedly covered under the "law of the land" instead of the "law of the seed," analogous to assertions and claims commonly associated with so-called self-proclaimed sovereign citizens, who believe they are not subject to any federal laws or jurisdiction within the United States.[3]  The defendant also initially denied that there was anything of note in the safe at the hotel, but later admitted that the safe did in fact contain ammunition.  The defendant also admitted that the white crystalline substance was methamphetamine and that he had used meth about four days prior.

In December 2024, a grand jury returned a four-count Indictment against the defendant, charging him with Possession of Unregistered Firearms, namely eight

---

[3] According to open-source research, American State Nationals is a group which professes the ideology commonly referred to as the sovereign citizen movement. American Nationals often reject the label "sovereign citizen" because they see it as an oxymoron—professing autonomy by using the word "sovereign," while simultaneously associating with a group by referencing "citizen." American Nationals believe that they can declare themselves sovereign, or private parties, and no longer be subjected to the rules and laws of the U.S. government. This extends to the belief that sovereign citizens or "privates" do not have to obey criminal laws.  (*See* PSR pp. A.2-A.3)

destructive devices, in violation of 26 U.S.C. §§ 5861(d) and 5871 (Count 1), being a Felon in Possession of Explosives, in violation of 18 U.S.C. §§ 842(i)(1) and 844(a)(1) Count 2), and being a Felon in Possession of Firearms and Ammunition, each in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (Counts 3 and 4). (PSR ¶ 1; ECF 5) Counts 1 and 2 each carries a maximum term of 10 years' imprisonment, while Counts 3 and 4, each carries a maximum term of 15 years' imprisonment. (PSR ¶¶ 77, 82)

On September 10, 2025, the defendant pleaded guilty to Count 1 of the Indictment pursuant to a plea agreement filed with the Court. (PSR ¶ 2; ECF 45, 46) The plea agreement contemplated an adjusted total offense level of 23, with a criminal history category of II, resulting in a Guidelines range of 51 to 63 months' imprisonment. (PSR ¶ 2; ECF 46, ¶ 7.f.)

On December 5, 2025, the United States Probation Office issued a final PSR, finding the total offense level to be 23 and criminal history category to be I,[4] resulting in an advisory Guidelines' range of 46 to 57 months' imprisonment, and a supervised-release period of not more than three years. (PSR ¶¶ 25, 42, 78, 84) The Guidelines range determined by the PSR differed from that contemplated by the plea agreement, because the parties estimated a criminal history category of II. (PSR ¶¶ 2, 34, 83, p. A.1; ECF 46, ¶ 7.f.)

---

[4] The PSR also determined the defendant has a total criminal history score of 1, though noting that many of the defendant's prior criminal convictions had decayed, "suggest[ing] that his criminal history may be understated." (PSR ¶¶ 42, 100)

7

**ARGUMENT**

In following the sentencing methodology laid out by the Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. Section 3553(a) requires the Court to consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). But a district court is not required to provide a mechanical recitation of the Section 3553(a) factors and has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence. *United States v. Masood*, 133 F.4th 799, 809 (8th Cir. 2025); *United States v. Dennis*, 131 F.4th 913, 917 (8th Cir. 2025).

A. **The Guidelines Calculations**

The United States agrees with the PSR-calculated total offense level of 23, criminal history category of I, and Guidelines range of 46 to 57 months.[5] For the

---

[5] The government preliminarily objected to the defendant's 2014 felony terroristic threats conviction receiving 0 criminal history points, for which he was sentenced to stayed 15 months' prison and from which he was discharged from probation in September 2019. (PSR ¶ 34 & p. A.1; ECF 50)

8

following reasons, the United States respectfully recommends a sentence of 57 months' imprisonment, the high-end of the applicable Guidelines range, as a sentence that is sufficient but not greater than necessary to comply with the § 3553(a) sentencing factors.

### B. The Section 3553(a) Factors

A consideration of the § 3553(a) factors amply warrants a sentence of 57 months' imprisonment for the defendant's possession of multiple destructive devices and other relevant conduct.

#### 1. Nature and Circumstances of the Offense

As detailed above, the defendant, a twice-convicted felon, possessed and carried over state lines eight assembled destructive devices, possessed over 800 rounds of ammunition, multiple high-capacity rifle magazines (loaded with high-velocity rounds), significant amounts of energetic black powder and black powder precursors, fuses, CO2 cartridges, and PVC pipes to construct multiple additional destructive devices, and a small quantity of methamphetamine, all while adhering to and espousing anti-government sovereign citizen ideology. Despite the defendant's objection to the PSR's reference of him as an American National Assembly member endorsing sovereign citizen ideology, (PSR p. A.2), the evidence gathered in this case and the defendant's own words underscore the defendant's belief and reliance on such ideology.[6] (*See id.* pp. A.2-A.3; *See, e.g.*, PSR ¶¶ 37, 52, 57)

---

[6] Indeed, as recently as October 21, 2025, during a recorded jail call, the defendant advised an acquaintance, who complained about law enforcement purportedly harassing her, to go after law enforcement personnel's "bonds," believed to be a reference to a common sovereign citizen tactic to file

9

Given the highly charged and politicized state of the nation, coupled with the growing general sentiment of law enforcement distrust, a defendant-felon espousing sovereign citizen type rhetoric while armed with multiple destructive devices, hundreds of rounds of ammunition, including multiple high-capacity rifle magazines with high-velocity rounds, makes the nature and circumstances of the offense particularly concerning.

The nature and circumstances of the defendant's offenses readily warrants a sentence of 57 months' imprisonment.

2.  History and Characteristics of the Defendant

The United States submits that the PSR accurately and adequately describes the defendant's criminal history, personal history, and characteristics.

The defendant, who is 47 years old, has two prior felony convictions, (PSR ¶¶ 33, 34), including a 2014 terroristic threats involving the use and brandishing of a loaded 9mm firearm, though the conviction is over ten years old.[7] (PSR ¶ 34) The defendant also has four prior misdemeanor and gross misdemeanor convictions, including a May 2024 Wisconsin state conviction for bail jumping, (PSR ¶ 40), as well as 41 misdemeanor or petty misdemeanor traffic-related offenses incurred between 2019 and 2024, (PSR ¶ 41). In one 2020 case that was reduced to a no-driver's-license petty misdemeanor, the defendant allegedly attempted to pull over another driver

---

baseless liens or suits against law enforcement personnel to try to get charges dismissed or to immunize themselves from criminal charges.

[7] An additional count of second-degree assault with a dangerous weapon was dismissed as part of a plea agreement. (PSR ¶ 34)

while driving a vehicle equipped with remote control front-and-rear flashing emergency lights, and the defendant armed with an operational stun gun. (PSR ¶¶ 36, 43) Despite the somewhat significant volume of criminal history, the defendant only has one criminal history point because nearly all of his prior convictions have decayed. (PSR ¶ 100) Accordingly, the defendant's criminal history appears somewhat understated. (Id.)

The defendant has an otherwise unremarkable personal and family history, with no reported dysfunctional familial relationships, upbringing, violence at home, or adverse childhood experiences. (PSR ¶¶ 48-51, 60) The defendant also has an eight-year history of military service with the Army National Guard. (PSR ¶ 70) While detained on the present offenses, the defendant completed educational sessions, including a 200-hour high school equivalency preparation program, despite obtaining his GED in 2002. (PSR ¶¶ 67, 69) The defendant is also an ASE certified mechanic. (PSR ¶¶ 67-68)

The defendant does, however, have a significant substance abuse history, specifically methamphetamine, that has negatively impacted his employment, personal relationships, and his housing—reporting that he has been homeless since March 2024 until his arrest for the present offenses. (PSR ¶ 53-54, 62-65, 71) The defendant also has a long history of marijuana use. (PSR ¶ 63) It appears that the defendant could benefit from substance abuse treatment while incarcerated and while on supervised release. (PSR ¶ 65)

The defendant also has some mental and emotional health history stemming from a 2007 ADD diagnosis, for which he has never sought professional services and has not consistently taken medication. (PSR ¶ 57) The defendant participated in mental and emotional health programming while detained for the present matter, (PSR ¶ 58), but he could likely benefit from additional programming while incarcerated with the BOP and while on supervised release.

### 3. Needs of Sentencing and Other 3553(a) Factors

A sentence of 57 months, is amply warranted by the needs of sentencing and other Section 3553(a) factors. While few mitigating factors exist, such as the defendant's mental health issues, aggravating factors exist that warrant consideration and weight such as the very dangerous nature of the offense, the defendant's felonious possession of multiple destructive devices, explosive black powder, hundreds of rounds of ammunition, multiple high-capacity rifle magazines loaded with high-velocity rounds, all while regularly abusing methamphetamine and adhering to anti-government sovereign citizen ideology, exemplifying his recalcitrance with respect to the rule of law. *See United States v. Godfrey*, 668 F. App'x 201, 203 (8th Cir. 2016) (per curiam) ("Congress specifically made general deterrence an appropriate consideration . . . and [the Eighth Circuit has] described it as 'one of the key purposes of sentencing.'") (quoting *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010)).

On balance, a sentence of 57 months, the high-end of the applicable Guidelines range, would serve the needs of sentencing to reflect the seriousness of the offense, to

promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to avoid sentencing disparities, and to protect the public from further crimes of the defendant.

## CONCLUSION

For all the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 57 months' imprisonment, with three years' supervised release, including a condition that the defendant be subject to search based on reasonable suspicion of contraband or other supervised release violation. The United States also recommends that the defendant participate in substance-abuse and mental-health programming while serving his sentence and while on supervised release, and that he be screened for Re-Entry Court following his release from BOP.

Respectfully submitted,

Dated: December 30, 2025

DANIEL N. ROSEN
United States Attorney

/s/ *Benjamin Bejar*

BY: BENJAMIN BEJAR
Assistant United States Attorney
District of Minnesota